OPINION OF THE COURT
Bernard M. Bloom, S.
In this proceeding for letters of administration, petitioner has submitted voluminous and facially compelling evidence tending to prove that she is the natural, nonmarital daughter of decedent, who died on May 26, 1981 survived also by two sisters and by issue of a predeceased brother.
The reciprocal rights of intestate distribution between children born out of wedlock vis-a-vis their fathers and paternal kindred are governed by EPTL 4-1.2 where, as here, the parents did not later intermarry (see Domestic Relations Law, § 24). Petitioner concedes that there was neither an order of filiation entered during decedent’s lifetime nor a witnessed acknowledgment of paternity filed with the State’s putative father registry within 60 days of its making, either of which would, under the current form *204 of respective clauses (A) and (B) of EPTL 4-1.2 (subd [a], par [2]), legitimate a nonmarital child for purposes of intestate succession. Consequently, for a predicate to her appointment as administratrix, she is forced to rely upon the third and final avenue, EPTL 4-1.2 (subd [a], par [2], cl [C]), enacted on April 21, 1981, five weeks prior to his death. This most recent expedient, in contradistinction to the other two, is not dependent upon the existence of any specific document; it confers distributive status if “paternity has been established by clear and convincing evidence and the father of the child has openly and notoriously acknowledged the child as his own.”
Before affording an evidentiary hearing to establish whether this bifurcated test is met in the instant case, it must be determined whether or not all prospect of petitioner’s eventual success under EPTL 4-1.2 (subd [a], par [2], cl [C]) is foreclosed as a matter of law.by the enactment’s provision that it “shall take effect on the first day of September next succeeding the date on which it shall have become a law” (L 1981, ch 75, § 3).
The question presented is not reducible to a simple choice between “prospective” versus “retrospective” application of the April 21,1981 enactment, since as a practical matter, these terms import little divorced from a given procedural context. This is evident from the radical consequences of a finding that the liberalization in question was intended to be either “prospective” or “retroactive” in unadulterated form. Pure prospectivity would mean, in theory, not only that the amendment’s effect would be confined to the intestate property of those who died on or after September 1,1981, but also that the acts constituting the clear and convincing evidence of paternity and the open and notorious acknowledgment of the nonmarital child must occur on or after that date. Complete retrospective operation, on the other hand, would permit persons entitled to distributive status under this newest method of proof to present their claims regardless of when the decedent’s death occurred and irrespective of a prior judicial determination of the identity of the distributees.
Spectres having such drastic and obviously unintended consequences may be dismissed offhandedly. In matters of *205 descent and distribution, evidence of antecedent events underlying the ultimate fact is not precluded as long as the opportunity for proof itself is not (see, e.g., Dodin v Dodin, 16 App Div 42, affd 162 NY 635 [a law granting adopted children the same distributive rights as natural children was applicable to a decedent who died after its enactment though the adoption had occurred before its passage]; see, also, McKinney’s Cons Laws of NY, Book 1, Statutes, § 56), while, on the other hand, a change in the class of statutory distributees is not to disturb the finality of final or intermediate judicial decrees (see, e.g., Matter of Germaine, 268 NY 475 [act allowing next of kin of predeceased spouse to succeed to intestate property of decedent who left no family members could not be invoked to disturb a decree which had directed deposit of the assets with the State for the benefit of unknown distributees]; Matter of Fay, NYLJ, July 8, 1980, p 11, col 4 [1979 amendment to EPTL 4-1.2 permitting a predeceased father’s kindred to take in intestacy from his illegitimate child under the same circumstances in which the father himself could have, had he survived the child, did not subject a 1975 intermediate decree which had dismissed the claim of one of such paternal relatives to attack]).
This said, the true focal question becomes whether or not, as has been held by Surrogate Laurino in Matter of Smith (114 Misc 2d 346), the provision that the act “shall take effect” on September 1, 1981 is a directive that it be applied only with respect to those who died on or after that date. Such a result is eminently easy to apply. If, however, this court should differ with what may be termed, for purposes of this opinion, the “strictly prospective” construction given by my esteemed and learned colleague, the limits of the retrospective effect to be accorded to the liberalization shall remain to be defined for the guidance of prospective claimants and their counsel.
We return to the threshold question. The only substantive change in EPTL 4-1.2 accomplished by the April 21, 1981 amendments other than the addition of EPTL 4-1.2 (subd [a], par [2], cl [C]) was the deletion of the requirement that an order of filiation under EPTL 4-1.2 (subd [a], par [2], cl [A]) and the formal acknowledgment of paternity *206 under EPTL 4-1.2 (subd [a], par [2], cl [B]) be respectively obtained or executed no later than 10 years after the birth of the nonmarital child. Both the actual text of the amended statute and its September 1,1981 “effective” date were adopted in wholesale fashion from the proposal advanced by the Law Review Commission. None of the materials included in the bill jacket, whether detailing the commission’s purposes in recommending the amendments, or recording the favorable views of such bodies as the Department of Social Services and appropriate committees of the New York State Bar Association and of the Association of the Bar of the City of New York, define the meaning of the “effective” date or otherwise address the subject of the extent of the proposed legislation’s operation directly. These various commentaries are, however, replete with adversions to the fact that subdivision (a) (par [2], cl [C]) of the proposed legislation would remedy the injustice inherent in the existing statutory scheme under which nonmarital children through no fault of their own, but rather by dint of the failure of their fathers to file a formal acknowledgment of paternity or of other persons to obtain an order of filiation on their behalf, were denied distributive status, even when paternity and the fact of acknowledgment were not open to serious question. The dissenting opinion of Judge Cooke in Matter of Lalli (43 NY2d 65, 70, 71-72), in which a majority of the Court of Appeals, upheld in due course by the Supreme Court of the United States (Lalli v Lalli, 439 US 259) held that former EPTL 4-1.2 was not unconstitutional insofar as it permitted an illegitimate to succeed to his father’s intestate property only if an order of filiation had been entered during the father’s lifetime is quoted at length in the report of the Law Revision Commission: “The requirement of an order of filiation made during the lifetime of the father will, ipso facto, exclude a substantial category of illegitimate children from inheritance. If this exclusion resulted from a lack of proof it might be justifiable. But in reality not obtaining an order of filiation will often result simply from the fact that the putative father is supporting and acknowledging the children as his own. Or, it might well be and often is the product of carelessness or ignorance on the part of those *207 who might institute a proceeding within the statutory limitation, for neither of which should a child suffer. Indeed, ordinarily the order will be obtained only where the natural father is not providing support. The children who are voluntarily supported, no matter how compelling the proof, will be absolutely barred if such an order is not obtained.” (Law Revision Recommendation to the 1981 Legislature, NY Legis Doc, 1981, No. 65 [C], reprinted in McKinney’s 1981 Session Laws of NY, p 2302.)
Insofar as the addition of EPTL 4-1.2 (subd [a], par [2], cl [C]) was designed to correct imperfection in prior law, and insofar as it may be considered to consist of a procedural mechanism to enhance enjoyment of pre-existing substantive right, it tends to countervail the general rule of statutory construction that retrospective operation is disfavored (see McKinney’s Cons Laws of NY, Book 1, Statutes, §§ 35, 51-55). In addition, it has been observed that statutes affording inheritance rights to illegitimates, being in derogation of the common law, are remedial in purpose and deserving of a liberal construction. (Matter of Karenius, 170 Misc 652; but see Matter of Bell v Terry & Tench Co., 177 App Div 123.) However, it has often been said that the Legislature may not make a law retroactive so as to impair vested rights and that the area of descent and distribution of estates, in particular, is governed by the law in effect upon the date of the decedent’s death. (See, e.g., People v Powers, 147 NY 104; Dodin v Dodin, 16 App Div 42, affd 162 NY 635, supra; Matter of Luber, 109 Misc 2d 1065; Matter of Fay, NYLJ, July 8, 1980, p 11, col 4, supra; Matter of Rodriguez, 100 Misc 2d 983; Ferrie v Public Administrator, 3 Bradf 249; see, also, McKinney’s Cons Laws of NY, Book 1, Statutes, § 56). Moreover, since a law becomes effective 20 days after its approval unless a different time is prescribed therein (Legislative Law, § 43), there is authority to the effect that postponement of its effective date is some evidence that the Legislature did not intend it to be retroactive (Matter of Kaufman, 158 Misc 102 [valuation of charitable bequests for purposes of the mortmain statute was to be made by the decisional method in use on the date of testator’s death rather than by the statutory method subsequently enacted which bore a post *208 poned effective date], cited with approval in Matter of Mulligan v Murphy, 14 NY2d 223 [law deleting requirement that a delinquent parolee serve that portion of his original sentence measured from his release on parole to the date his delinquency was declared held not applicable to reduce sentences previously imposed except as to portions remaining unserved upon the act’s future effective date]).
Quite obviously, EPTL 4-1.2 (subd [a], par [2], cl [C]) does not lend itself to facile dispositive categorization. Under these circumstances, the flexible, pragmatic approach to retroactivity analysis employed by the Court of Appeals in Becker v Huss Co. (43 NY2d 527), where an analogous instance of the conflict of canons of statutory construction was encountered, and evident as well in its recent decisions in related contexts (see, e.g., Gurnee v Aetna Life & Cas. Co., 55 NY2d 184 [retroactivity of decisional rule interpreting ambiguous substantive provision of the Insurance Law]; Gager v White, 53 NY2d 475 [effect to be given to United States Supreme Court decision vitiating the predicate for a State’s exercise of quasi in rem jurisdiction over an insured nonresident defendant]; People v Pepper, 53 NY2d 213 [retrospective operation of decision expanding the scope of the constitutional guarantee of the right to assistance of counsel]; Matter of Beary v City of Rye, 44 NY2d 398 [applicability of amendment to General Municipal Law liberalizing provisions governing relief from failure to file timely notice of claim]) is appropriate. In deciding that an amendment to the Workers’ Compensation Law requiring a lienor to contribute to an employee’s expenses in securing a third-party recovery applied with respect to accidents which occurred and actions which were commenced before its enactment where there had been no settlement or judgment, the court observed (Becker v Huss Co., supra, pp 540-541):
“As is often the case the classic canons of statutory construction hardly settle the controversy * * *. True, it is encyclopedic blackletter that amendments are prospective only unless retroactive application is ‘clearly’ spelled out (McKinney’s Cons Laws of NY, Book 1, Statutes, § 52; see 56 NY Jur, Statutes, § 265; 82 CJS Statutes, § 432). It is *209 just as often said that exception is generally made for so-called remedial legislation or statutes dealing with procedural matters (see 2 Sutherland Statutory Construction [4th ed, Sands], § 41.09, pp 280-281; McKinney’s Cons Laws of NY, Book 1, Statutes, §§ 54-55). Numerous cases in this court restate and apply the familiar generalities but in contexts which exemplify their proper and restricted applicability (see, e.g., Matter of Deutsch v Catherwood, 31 NY2d 487, 489-490; Shielcrawt v Moffett, 294 NY 180, 188 [Lehman, Ch. J.]). Thus, however helpful the maxims when discriminately used, they should not be abused as talismanic * * *. Frankfurter put it so well: ‘Nor can canons of construction save us from the anguish of judgment. Such canons give an air of abstract intellectual compulsion to what is in fact a delicate judgment, concluding a complicated process of balancing subtle and elusive elements’ (Frankfurter, supra, 47 Col L Rev 527, 544).
“Although, obviously, one might characterize the amendment as remedial, the ‘remedy’ has a direct economic impact on carriers, saddling them with financial obligations not contemplated when prior insurance premiums had been computed. Similarly, calling the legislation procedural is fraught with difficulties, for in its implementation the employee gains the right to what might be a considerable sum. It is thus not the verbal category, be it remedial, nonremedial, substantive, or procedural, into which the amendment might be slotted for lack of more subtle subclassification that sheds light on the issue. It falls comfortably in none. Instead, examination of legislative intent, if it be discernible, recognition of the flexibility of the compensation law in achieving its social goals, and consideration of the practicalities and the realities offer more fruitful and sounder analysis.”
Of course we are not here dealing with a question of compensation law. In attempting to utilize this approach, the oft-repeated statement that the persons entitled to share in an estate are those who so qualify on the date of the decedent’s death warrants further examination. If it is expressive of a barrier of constitutional proportion peculiar to the law of descent and distribution, it obviates further discussion of legislative intent with respect to intestates *210 who died prior to the enactment of EPTL 4-1.2 (subd [a], par [2], cl [C]) on April 21, 1981. (The court cannot agree with Surrogate Laurino’s holdings [Matter of Henry, NYLJ, Feb. 8, 1982, p 14, col 3; Matter of Charles, NYLJ, Feb. 8, 1982, p 14, col 4] that this inquiry is likewise relevant with respect to those who died in the interim between enactment of the amendment and its September 1, 1981 “effective date”; assuming, arguendo, that rights of succession are indefeasibly vested at death, the applicability of the statutory change to this class of persons raises a question of legislative intent but no question of colorable constitutional dimension. Though the instant decedent was among this group, the broader question shall be considered here for the guidance of future litigants.)
Almost invariably, the holding or dictum in a given case that the Legislature may not divest those who qualify as distributees at the date of death of intestate property in favor of others is either entirely unexplicated or placed upon a vague recitation that such action is beyond its province. (See, e.g., Ely v Ely, 163 App Div 320, affd sub nom. Ely v Megie, 219 NY 112 [repeal of provision of mortmain statute under which a charitable bequest in a will executed within two months of death was nullable at the option of a surviving wife, child or parent did not prevent the annulment of such bequest where testator had died prior to the repeal even though the will was probated thereafter]; Dodin v Dodin, 16 App Div 42, affd 162 NY 635, supra [Legislature was free to equate adopted children with natural children for purposes of intestate succession at any time before an intestate’s death] [dictum]; People v Powers, 147 NY 104, supra [a charitable gift which was invalid for indefiniteness when testator died was not validated by enactment of the Tilden Act]; White v Howard, 46 NY 144 [an act permitting a particular charitable body to accept land devised to it did not validate a devise where testator died before the charity was so empowered]; Wissel v Ott, 34 App Div 159 [an 1895 law legitimating offspring whose parents later married could not make the child a distributee of a parent who died before its enactment] [dictum]; Matter of Rodriguez, 100 Misc 2d 983, supra [benefit of 1979 amendment to EPTL 4-1.2 providing for *211 intestate distribution to and from children born out of wedlock where a witnessed acknowledgment of paternity had been filed with the putative father registry could not be applied to estates of those who died before its effective date] [dictum]; cf. Ferrie v Public Administrator, 3 Bradf 249, supra [rests holding that statute affording illegitimate children distributive status in their mother’s estates upon default of lawful issue could not be applied to decedents who died prior to its enactment upon the due process clause]; Matter of Barringer, 29 Misc 457 [states that if 1895 statute legitimating children whose parents eventually married one another was intended to divest property from those who qualified to succeed to intestate property on the date of the parent’s death, such legislative intention would violate the due process clause]).
The constitutional overtones of these decisions is curious. There is no provision of the Constitution of the United States or of the Constitution of the State of New York which prohibits retroactive application of civil legislation and yet, with the exception of Ferrie v Public Administrator (supra), upon which heavy reliance was placed in Matter of Smith (114 Misc 2d 346, supra), and Matter of Barringer (supra), these opinions contain no explicit finding that the due process or equal protection clauses would be offended or that some other specific constitutional guarantee or proscription would be violated by legislation altering the description of the persons entitled to share in the estate after a given decedent’s demise. Indeed, the doctrine is said to be rooted not so much upon constitutional objections as upon the common law (McKinney’s Cons Laws of NY, Book 1, Statute, § 51, subd d) and cases may be found in which courts, while reaching analogous results on the facts have done so on the basis of lack of convincing evidence of a legislative purpose to affect estates of persons who died prior to the statutory change (see, e.g., Matter of Miller, 110 NY 216 [an act which granted adopted children the same exemption from an inheritance tax as had theretofore been granted to natural children “effective immediately” could not be invoked so as to overturn an order of the Surrogate’s Court which had affixed the tax]; Matter of Germaine, 268 NY 475, supra.[an enactment permitting *212 the next of kin of an intestate’s predeceased spouse to succeed to property not distributed on May 1,1929 was not invocable to disturb the finality of a 1920 decree directing deposit of the funds in the State treasury for the benefit of unknown distributees]), or have relied on that ground in addition to the quasi-constitutional one (see, e.g., Matter of Fay, NYLJ, July 8, 1980, p 11, col 4, supra [1979 amendment to EPTL 4-1.2 permitting the kindred of the father of an illegitimate child to take in intestacy from the child’s estate in the same circumstances in which the father himself could take was not applicable to permit a 1975 intermediate decree dismissing the claim of one of such paternal relatives to be opened]; Matter of Moynahan, 158 Misc 821 [facts similar to those of Matter of Germaine, supra]; Matter of Barringer, 29 Misc 457, supra [an 1895 statute legitimating those whose parents subsequently intermarried did not operate so. as to divest those who qualified as the distributees on the date of death of property in favor of the legitimated child]).
We think that these latter cases are better reasoned. In other contexts it has become apparent that the common-law notion of the sacrosanctity of vested rights which dictated the century old nisi prius decisions in Matter of Barringer (supra) and Ferrie v Public Administrator (3 Bradf 249, supra), has been supplanted by a far less rigid approach to the subject of the retrospective operation of statutes. As was noted by the Court of Appeals in Matter of Chrysler Props. v Morris (23 NY2d 515, 518-519): “When embarking on a journey into the realm of Vested rights’, it is dangerous indeed not to proceed with great caution for the concept is a fiction and hides many unmentioned considerations of fairness to the parties, reliance on preexisting law, the extent of retroactivity and the nature of the public interest to be served by the law. (Hochman, Retroactive Legislation, 73 Harv. L. Rev. 692.) The modern cases reflect more candid considerations of these relevant factors as well as a less inflexible view of the right of the Legislature to pass retroactive legislation.” (See, also, Matter of Berkovitz v Arbib & Houlberg, 230 NY 261 [Cardozo, J.]; Valladares v Valladares, 80 AD2d 244, app dsmd sub *213 nom. Tucker v Tucker, 54 NY2d 753; Chase Securities Corp. v Donaldson, 325 US 304.)
Hence, it may be concluded that judicial resistance to postdeath application of statutes which alter the description of the distributees in intestacy, while a historic fact, can properly claim no automatic constitutional imperative. In determining the extent of the operation of the 1981 amendments to EPTL 4-1.2, then, each measure of possible retrospective effect must be weighed in light of these due process considerations of fairness to the parties, reliance on pre-existing law and the nature of the public interest to be served.
Recourse to the liberalization in question cannot withstand these due process considerations where its purpose is to open a decree under which distributive rights were fixed under prior law or to disturb estates where final distribution was made even where no formal judicial settlement was obtained. Persons whose expectations of distributive status were thus confirmed are entitled to rely upon those determinations to prevent abrogation of their property interests; moreover, the same conclusion inescapably follows from the sheer unworkability of the opposite course, not to say the amendment’s postponed effective date. But, putting aside for a moment the question of what was actually intended by the Legislature, and viewing the matter abstractly, it seems that the due process argument against affording the benefit of this particular statutory change to proceedings pending or initiated after its enactment, though the intestate had died prior thereto, is far less cogent where neither of these indicia of reliance intervened. New EPTL 4-1.2 (subd [a], par [2], cl [C]) does not entail the substitution of an intrinsically distinct class of persons in place of those who qualified as distributees at the instant of death; rather, it creates merely a third method of proving the ultimate fact of an individual’s membership in a theretofore recognized distributive category — that of persons born out of wedlock whose paternity can be established with an acceptable degree of certainty.
Ferrie v Public Administrator (3 Bradf 249, supra) and Matter of Barringer (29 Misc 457, supra), whatever the merits of their nineteenth century due process arguments, *214 may be readily distinguished on this basis. The former, for example, resembled the present case insofar as the question presented likewise was whether to accord status to an illegitimate child whose claim to the right to receive letters of administration was derived from a succession statute enacted subsequent to the death of the intestate. But there the similitude ends. In Ferrie, the subject enactment (L 1855, ch 547, eff April 18, 1855) which permitted illegitimate children to succeed to the estates of their mothers in default of lawful issue, conferred upon those benefited a wholly new substantive right in no wise enjoyed at an earlier date by any nonlegitimated child, since prior to that time New York clung to the common-law rule that such children had no right to intestate succession in the estate of either parent. Thus, in contrast to the matter at bar, application of the new statute in the circumstances there presented would have deprived those who had qualified as distributees on the date of death of intestate property in favor of a category of persons who had had not even conditional status at that time and with respect to whose claims the public could have had little or no inkling.
While it cannot be denied that EPTL 4-1.2 (subd [a], par [2], cl [C]) itself affects, and, indeed, shapes, substantive rights to some extent, it is, nevertheless, we conclude, primarily of an adjective nature and as such could be applied to all proceedings pending upon or arising after its enactment, regardless of the date of death, if the Legislature so chose (see Matter of Casper, 161 Misc 199 [a law removing the bar against receipt of a will draftsman’s testimony concerning its preparation and construction was applicable though testator died prior to its adoption]), subject to the proviso that no incompatible judicial decree had been entered and that distribution had not been made.
As we have seen, the precise legislative intent with respect to retroactivity was not explicated, except, of course, insofar as the liberalization cannot be applied to proceedings concluded before September 1,1981 even if the intestate, perchance, died after its enactment on the preceding April 21. It remains now to attempt to construct it from extraneous sources or at least, to establish a judicial rule of choice.
*215 We begin by noting what EPTL 4-1.2 (subd [a], par [2], cl [C]) does not provide, namely, an express directive that in all cases the intestate property of those who died prior to its September 1,1981 “effective” date is to be unaffected by it. The 1855 law considered in Ferrie v Public Administrator (3 Bradf 249, supra), the first inroad upon the common-law doctrine of nullius filius, by contrast explicitly provided that, though it was effective immediately, it was not to affect any right in or title to real or personal property already vested in the lawful heirs of any person theretofore deceased. This practice was followed in most of the subsequent enactments by which the rights of intestate succession by, through or from persons born out of wedlock were created or augmented both directly (see L 1929, ch 229, § 6; L 1963, ch 712, § 1; L 1965, ch 958, § 1) or indirectly, by general legitimation (see L 1895, ch 531; L 1899, ch 725; L 1961, ch 843, §1; L 1969, ch 325, §1). While a few instances exist in which such provisos were omitted but might be thought to/have been implicit by reason of their similarity to those cited (see, e.g., L 1896, ch 547, § 289; L 1903, ch 225; L 1919, ch 202; L 1962, ch 313, § 6), the amendment with which we are concerned does not appear to be among them. Again, the addition of EPTL 4-1.2 (subd [a], par [2], cl [C]), unlike these purely substantive changes, accomplished an essentially evidentiary change affecting existing substantive rights only incidentally. Under these circumstances, the absence of an express limitation of its effect to the estates of those who died prior to its enactment or effective daté, then, furnishes some evidence that it was not intended to be so confined, or, at the minimum, that the extent of its retrospective effect was deliberately left for judicial resolution.
The legislative history of EPTL 4-1.2 itself (L 1967, ch 686, § 28), originally enacted on March 1, 1966 as section 83-a of the Decedent Estate Law (L 1965, ch 958, § 1), is instructive. The Bennett Commission was the moving force behind the enactment. After supplying the Legislature with a comprehensive study which traced the history of the intestate succession rights of nonlegitimate children from ancient times, its report noted that of the 50 States, only New York and Louisiana remained so illiberal as to con *216 fine such rights to succession to the mother’s estate where no legitimate issue survived. (Fourth Report of Temporary State Comm on Modernization, Revision and Simplification of Law of Estates, NY Legis Doc, 1965, No. 19, Report No. 1.8A, p 263.) Characterizing this policy as “harsh”, “inequitable” and even “inhuman”, and refuting the notion that enlargement of the succession rights of children born out of wedlock would promote premarital affairs and marital infidelity by the observation that existing law actually benefited the parents by largely relieving them of financial responsibility for their child while permitting the mother and her entire family to inherit from hint or her, the commission recommended a number of reforms, all of which were adopted. Illegitimate issue were equated with legitimate issue for the purpose of sharing in the estates of their mothers. They were also permitted for the first time to succeed to intestate property of their maternal kindred. Most important for our purposes, they were made legitimate children of their fathers (though not of their paternal kindred) if a court of competent jurisdiction had made an order of filiation in a proceeding instituted at any time not later than the child’s second birthday.
In urging these changes, the Bennett Commission {id., p 265) specified that they were intended “to grant to illegitimates in so far as practicable rights of inheritance on a par with those enjoyed by legitimate children while protecting innocent adults and those rightfully interested in their estates from fraudulent claims of heirship and harassing litigation”. There was also an explicated intent that the liberalizations operate beyond strict questions of distributive rights to remedy the “retarding influence” that existing law had exercised with respect to judicial construction of the word “child” when used in a statute, will or deed and in the area of distribution of wrongful death proceeds. (Bennett Comm, Fourth Report, op. cit., pp 263-264.)
Notwithstanding the breadth of these aims, the commission and the Legislature declined to permit the fact of paternity to be established by any means other than an order of filiation. It was felt at that time that acceptance of alternate methods in use in a number of other States, such as proof by a written acknowledgment of paternity and/or *217 by testimony that the deceased had notoriously acknowledged the child, would provide insufficient protection against fabricated claims. That this concern was purely evidentiary is shown by the commission’s statement that the requirement that the order of filiation be obtained within two years of the child’s birth reflected the two-year Statute of Limitations applicable to paternity proceedings generally and was not to apply to orders of filiation entered upon voluntary acknowledgments (Bennett Comm, Fourth Report, op. cit., p 267; see, also, Matter of Capuano, NYLJ, June 16, 1978, p 17, col 4).
The amendments to the statute have included extension of inheritance rights to and from the paternal kindred whenever paternity could be established in the manner required by the statute (L 1979, ch 139, § 1, eff May 29, 1979) and the lengthening to 10 years and, eventually, the removal, of the original two-year time limit for creation of proof of paternity measured from the child’s birth date (L 1979, ch 139, § 1; L 1981, ch 75, § 1). Permitting the nonmarital child to be an intestate distributee in the estates of his paternal relatives and allowing such kin to succeed to the child’s property represented a departure from the Bennett Commission’s reasoning that such provision would often create an extended family group that did not exist in fact (see Fourth Report, op. cit., p 266). The other measures, however, together with the addition of the two newer methods of legitimation for succession purposes, namely, the filing of a witnessed acknowledgment of paternity with the putative father registry (L 1979, ch 139, § 1) and, more recently, adduction of clear and convincing evidence of paternity coupled with proof of open and notorious acknowledgment, are merely legislative refinements designed to better implement the broad public policy articulated at length in the Bennett Commission’s report upon the strength of which the original statute was adopted. That policy, as afore-mentioned, was to afford those born out of wedlock rights of inheritance on a par with those enjoyed by legitimate persons insofar as consonant with the need to prevent fraudulent claims on estates. And as it must be assumed that most intestates whose fatherhood can be established under EPTL 4-1.2 (subd [a], par [2], cl *218 [C]) would have desired the child or children whom they acknowledged to the world at large to take or share in their estates, the most liberal retrospective application consistent with practicality is appropriate (see, generally, Matter of Niles, 53 AD2d 983, mot for lv to app den 40 NY2d 809 [a filiation order making a child born out of wedlock the sole recipient of wrongful death proceeds could be entered after the death of the father nunc pro tunc where he had admitted fatherhood before the court in a paternity proceeding despite EPTL 4-1.2’s recital that the order must be entered during the father’s lifetime]; Matter of Kennedy, 89 Misc 2d 551; and Matter of Anonymous, 60 Misc 2d 163 [orders approving compromises of paternity proceedings involving payment of support where decedents had admitted their fatherhood were equivalent to orders of filiation for purposes of intestate succession though courts had made no explicit finding of paternity]; Matter of Abbati, NYLJ, Dec. 30, 1977, p 11, col 6 [children of a de facto marriage of 34 years’ duration found to be legitimate under EPTL 4-1.2 where no one appeared in opposition]).
The same reasoning is applicable to the 1979 amendment to EPTL 4-1.2 (L 1979, ch 139, § 1) which likewise was silent as to the extent of its retroactive operation, if any. That enactment lengthened the time period during which an order of filiation could be obtained which would serve to establish paternity for purposes of EPTL 4-1.2 from 2 years to 10 years after the birth of the child. More important, it created an alternative means of establishing the fact of paternity — the filing with the putative father registry within 60 days of its making of an acknowledged and witnessed admission of paternity made within 10 years of the birth of the child. It also extended reciprocal rights of succession to and from the paternal kindred for the first time. Surrogate Gelfand, in two reported decisions (Matter of Rodriguez, 100 Misc 2d 983, supra; Matter of Luber, 109 Misc 2d 1065, supra) expressed the opinion that the 1979 amendment was neither intended to, nor could constitutionally, affect estates of decedents who died before its enactment. It must be conceded that with respect to the new vehicle of proof established by the amendments there could be no proper occasion to apply it retroactively *219 though the putative father registry predated the amendment (see L 1976, ch 665, § 2 [Social Services Law, § 372-c]), the additional requirements relating to its execution and acknowledgment in the presence of a witness before a notary public or other authorized officer could not have been anticipated. However, this is not true of the other facet of the 1979 liberalization and insofar as these dicta would control the interpretation of the 1981 amendments, this court declines to follow them. In summary, the court finds that, with respect to reciprocal rights of succession of a child born out of wedlock and his or her natural father, the benefit of EPTL 4-1.2 (subd [a], par [2], cl [C]) is available in any proceeding pending upon September 1, 1981 or arising thereafter provided that distribution of the estate had not been theretofore accomplished and that no decree determining distributive status which was incompatible with the invocation of clause (C) was then in existence, and further provided that the intestate died on or after March 1,1966, the day on which inheritance rights between children born out of wedlock and their fathers were created.
As petitioner’s claim to distributive status meets these conditions, and as the right to letters of administration follows the distributive interest (Matter of Cesario, 103 Misc 2d 1), the matter is set down for a hearing at 2:00 p.m. on Monday, June 21, 1982, before Law Assistant Maureen O’Brien.