Ivy McFADDEN, as Administratrix of the Estate of Gregory Isiah McFadden a/k/a Gregory McFadden and Abdul Hadi, Deceased, Plaintiff-Appellee-Cross-Appellant,

v.

Detective Juan SANCHEZ, et al., Defendants-Appellants-Cross-Appellees,

and

The City of New York, Defendant.

Nos. 993, 1150, Dockets 82–7714, 82–7744.

United States Court of Appeals, Second Circuit.

Argued March 14, 1983.

Decided June 14, 1983.

Certiorari Denied Nov. 7, 1983.

See 104 S.Ct. 394.

Edward F.X. Hart, New York City (Frederick A.O. Schwarz, Jr., Corp. Counsel of the City of New York, Leonard Koerner, New York City, on the brief), for defendants-appellants-cross-appellees.

Harold F. Goldwasser, New York City, for plaintiff-appellee-cross-appellant.

Before MANSFIELD, MESKILL and NEWMAN, Circuit Judges.

NEWMAN, Circuit Judge:

In this appeal four New York City police officers challenge a $200,000 punitive damage award assessed against them jointly in the June 1, 1982, judgment of the District Court for the Southern District of New York (Robert J. Ward, Judge). The $200,000 punitive damages award was levied by a jury after it found that the four officers had violated the constitutional rights of Gregory McFadden in an attempted arrest that resulted in McFadden's death. This suit was filed by Ivy McFadden, Gregory McFadden's mother and administratrix, pursuant to 42 U.S.C. § 1983 (Supp. IV 1980). Because we conclude that in section 1983 actions liability for punitive damages and their amount must be determined on an individual basis, we vacate the award of punitive damages and remand for a new trial limited to punitive damages.

I.

On February 18, 1980, several New York City police officers conducted a "decoy operation" at a busy intersection in the Bronx. Officer Patricia Hear, while making a telephone call in an open booth, wore a shoulder bag that was left open revealing a wallet containing several dollar bills. Gregory McFadden approached Officer Hear, pretended to make a phone call in the next booth, and then snatched the wallet from her bag. As McFadden walked away from the telephone booths, Officer Michael Ciravolo and Detective Juan Sanchez, two plainclothesmen who were stationed in nearby stores, intercepted him. Ciravolo grabbed McFadden's right arm, Sanchez his left. They identified themselves as police officers and asked McFadden to accompany them away from the intersection to be arrested.

At this point, the witnesses' versions of the episode differ. According to the police officers, McFadden began to struggle as Sanchez was handcuffing him. Despite the two officers' efforts to restrain their suspect, McFadden continued to fight. Officer Hear, seeing the struggle develop, ran over to the three men and attempted to hit McFadden with her shoulder bag and handcuffs, but was knocked away by the group, which was spinning in a circle. Sergeant Robert Pezzano, the senior police officer supervising the operation, then entered the fray and grabbed McFadden's head. By bending down, McFadden broke Pezzano's grip. As he bent over, McFadden caught sight of Officer Ciravolo's gun. McFadden grabbed the gun and pointed it at Ciravolo's groin. Ciravolo yelled, "He has my gun," and jammed his hand between the gun's hammer and cylinder to prevent it from firing. After a few moments, Ciravolo's grip on the gun loosened, as McFadden raised the weapon to Ciravolo's chest. Ciravolo screamed, "I can't hold on any more," and Sergeant Pezzano fired his gun into McFadden's back. McFadden was taken to Union Hospital, where he died.

The plaintiff's main witness gave a markedly different version of the shooting. The witness testified that he first saw McFadden accompanied by three men who the witness did not realize were police officers since they were in plain clothes. Ten to twelve feet away from where the witness was standing, the officers stopped McFadden and grabbed his arms. About a half a

minute later one of the officers said, "You tore my jacket," and a brief tussle ensued. The officers forced McFadden up against a wall, with one officer on either side of McFadden holding his arms and another officer in front of McFadden. The officer in front of McFadden, whom the witness identified as Officer Ciravolo, hit McFadden in the face for three or four minutes. According to the witness, up to this point, McFadden did not try to resist or escape the punches, but when he was about to be kneed in the groin, he said, "The hell with this" and "Kill me." The struggle between McFadden and the officers then resumed, and the next thing the witness heard was one of the officers saying either "He had my pistol" or "He has a gun." At this point, a woman (whom the witness could not identify as Officer Hear) jumped into the fight and tried to hit McFadden with what the witness thought was "something ... that looked like a billy." Moments later, while turned away from the struggle, the witness heard a shot. When he looked back, he saw McFadden lying face down on the ground with a handcuff on one hand. At no time did the witness see a gun in McFadden's hand.

Two other eyewitnesses gave slightly different versions of the shooting. A woman who was watching from across the street testified that she saw two men holding McFadden and a woman hitting him with her purse. Members of the group were speaking loudly, but the woman could not understand what they were saying. After a short struggle, there was a shot. Another witness who testified for the defendants said that he saw McFadden fight with two policemen. According to this witness, while McFadden was struggling, a woman hit him with a black object that the witness identified as either an umbrella or a book. Another officer came to help the other three. This witness testified that he saw McFadden holding a gun, which the officers were trying to take away from him. In the course of the struggle, McFadden fell to the ground, still holding the gun. According to this witness, McFadden was shot while he was lying on the ground.

On February 26, 1981, Ivy McFadden, the deceased's mother and the administratrix of his estate, filed this suit under 42 U.S.C. § 1983 (Supp. IV 1980) for injuries suffered by the deceased in violation of his constitutional rights. Named as defendants were the City of New York and the four police officers involved in the incident. The complaint sought compensatory and punitive damages.

On April 27, 1982, one month before trial, the parties submitted and the District Court endorsed a pretrial order pursuant to Fed. R.Civ.P. 16. This pretrial order did not state that the plaintiff was seeking punitive damages. As it turned out, the omission of punitive damages was a mistake on the part of plaintiff's counsel. Near the end of the second day of trial, the mistake became evident, and the following colloquy ensued:

[Plaintiff's Counsel]: Your Honor, with regard to what you just said before about compensatory damages, we are seeking, according to the complaint, punitive damages.

The Court: You seem to have dropped that in the pre-trial order. The complaint may have alleged it originally, but the complaint also alleged a lot of other things. You want me to charge punitive damages as well? I'll charge it.

[Plaintiff's Counsel]: I would appreciate it.

[Defendants' Counsel]: Your Honor, may we take exception?

The Court: No, no. Nothing really has changed. He didn't have it in the pre-trial order. What I'll have, I'll have a separate question which I have already prepared anyway, Question 6, to a special verdict form: What amount, if any, is the plaintiff entitled to recover for punitive or exemplary award?

I will charge it separately. There will be a separate finding by the jury on that subject, and if you feel aggrieved by what has occurred you can argue the matter after the verdict, if there is need to do so.

The following day the jury heard the remainder of the testimony, which included the cross-examination of Detective Sanchez and the complete testimony of Sergeant Pezzano.

When the case was submitted to the jury, Judge Ward gave them a special verdict form, which included the following question on punitive damages: "What amount, if any, is plaintiff entitled to recover as a punitive or exemplary award?" The special verdict form gave the jury no opportunity to assess punitive damages individually as to each of the four defendants.[1] Judge Ward had instructed the jury that the defendants would be jointly liable for any punitive damages awarded.

After six hours of deliberations, the jury returned a verdict finding that all four officers had violated Gregory McFadden's constitutional rights and that none of the officers had established by a preponderance of the evidence a good faith defense. The jury awarded the plaintiff $25,000 compensatory damages and $200,000 punitive damages.

Judgment on the jury's verdict was entered on June 1, 1982. Two days later, plaintiff's attorney made a motion for attorney's fees under 42 U.S.C. § 1988 (1976). The application requested compensation for 179 hours at $150 per hour, yielding a lodestar amount of $26,850. The application further proposed awarding nearly three times the lodestar amount as a bonus. On September 2, 1982, the District Court ruled that plaintiff was entitled to compensation for 150 hours of legal work at $100 per hour with no bonus and therefore awarded plaintiff an attorney's fee of $15,000.

Before us now are an appeal by the individual defendants challenging the jury's assessment of punitive damages and a cross-appeal by the plaintiff challenging the reasonableness of the District Court's award of attorney's fees.

## II.

The issues on defendants' appeal concern the availability of punitive damages as a matter of law, the plaintiff's entitlement to seek such damages in this case in light of procedural developments before and during the trial, and the propriety of determining a single amount of punitive damages for which all four defendants are jointly liable.

A. The Supreme Court has recently reaffirmed the general availability of punitive damages in section 1983 actions. *Smith v. Wade,* —— U.S. ——, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *see Carlson v. Green,* 446 U.S. 14, 22, 100 S.Ct. 1468, 1473, 64 L.Ed.2d 15 (1980). Nevertheless defendants contend that such damages are barred in this case by a provision of New York law, since repealed, that prevents the survival of claims for punitive damages after the death of the plaintiff's decedent. *See* N.Y.Est. Powers & Trusts Law § 11–3.2 (McKinney 1967) (repealed 1982).[2] This provision was in effect at the time of McFadden's death. Defendants contend that this provision of state law should be given effect in this case because of the requirements of 42 U.S.C. § 1988. That section, now widely known for the attorney's fee provision added to it in 1976, *see* Civil Rights Attorney's Fees Awards Act of 1976, Pub.L. No. 94–559, § 2, 90 Stat. 2641, contains as its core provisions language derived from section 3 of the Civil Rights Act of 1866, ch. 31, 14 Stat. 27. That language specifies that in civil rights cases in which federal laws "are deficient in the provisions necessary to furnish suitable remedies," courts shall apply "the common law, as modified and changed by the constitution and statutes of the State wherein the court" sits unless such state law is "inconsistent" with federal law.

In *Robertson v. Wegmann,* 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978), the Supreme Court, applying 42 U.S.C. § 1988,

---

1. The liability of the City was not submitted to the jury because the Court had dismissed the claim against the City at the end of plaintiff's case.

2. *See also Myers v. City of Rochester,* 116 Misc.2d 83, 455 N.Y.S.2d 188 (Sup.Ct.1982) (rejecting punitive damage claim in state law cause of action against police officers acting within the scope of their employment).

permitted a state survival statute to limit the class of relatives entitled to bring an action under section 1983 on behalf of a decedent. However, the Court carefully noted that it was not deciding whether state survival statutes could totally preclude section 1983 claims on behalf of a decedent and pointedly distinguished a section 1983 claim for a deprivation of federally protected rights that caused the decedent's death. *Id.* at 594, 98 S.Ct. at 1997. Subsequently the Court declined to apply a state statute that would have barred survival of a *Bivens* claim for a death allegedly caused by federal officials, *Carlson v. Green, supra,* 446 U.S. at 23–25, 100 S.Ct. at 1474–1475, again noting that *Robertson v. Wegmann* had not involved a denial of rights resulting in death, *id.* 446 U.S. at 24, 90 S.Ct. at 1474.

■ Prior to *Robertson* and *Green* we had given effect to New York law to bar a claim for punitive damages in a section 1983 suit brought on behalf of a decedent in circumstances where the alleged denial of constitutional rights was unrelated to the death. *Duchesne v. Sugarman,* 566 F.2d 817, 821 n. 2 (2d Cir.1977). Whether or not our ruling in *Duchesne* has been impaired by *Robertson* and *Green,* we have no doubt that limitations in a state survival statute have no application to a section 1983 suit brought to redress a denial of rights that caused the decedent's death. *See Heath v. City of Hialeah,* 560 F.Supp. 840 (S.D.Fla. 1983); *O'Connor v. Several Unknown Correctional Officers,* 523 F.Supp. 1345 (E.D. Va.1981). To whatever extent section 1988 makes state law applicable to section 1983 actions, it does not require deference to a survival statute that would bar or limit the remedies available under section 1983 for unconstitutional conduct that causes death. State law that would preclude a claim for punitive damages in a case like the present one is manifestly "inconsistent" with federal law within the meaning of section 1988.

■ · B. The defendants challenge the award of punitive damages in this case on the procedural ground that the plaintiff waived her claim for such damages by omitting it from the pretrial order and that the District Court erred in permitting amendment of the order during the trial. A district court may permit modifications of a pretrial order "to prevent manifest injustice," *see* Fed.R.Civ.P. 16, though modifications should not be allowed that would seriously prejudice one of the parties. *See Jimenez v. Tuna Vessel Granada,* 652 F.2d 415 (5th Cir.1981); *Price v. Inland Oil Co.,* 646 F.2d 90 (3d Cir.1981). *See generally* 3 *Moore's Federal Practice* § 16.20 (2d ed. 1983). In *Brooks v. Wootton,* 355 F.2d 177 (2d Cir.1966) (per curiam), we ruled that a defendant was not unduly prejudiced by the addition of a punitive damage claim that had been omitted from the pretrial order, since the facts of the case made it clear to the defendant that punitive damages were a likely consequence and the defendant had time to adjust his defense to take into consideration the change.

The officers' claim of prejudice in this case stems from their understanding of New York's law of indemnification. Under N.Y.Gen.Mun.Law § 50–k(3) (McKinney Supp.1982), New York City is obliged to indemnify police officers for damages incurred while acting within the scope of their employment unless the damages resulted from "intentional wrongdoing or recklessness." The officers have assumed that this exception to the indemnity obligation applies to the punitive damages awarded in this case.[3]

The defendant officers argue that because the pretrial order did not contain a claim for punitive damages, they reasonably concluded they would not be subject to any unreimbursed personal liability at trial and

---

**3.** For purposes of this appeal, it is not necessary to determine the correctness of this assumption. In *Hartford Accident & Indemnity Co. v. Village of Hempstead,* 48 N.Y.2d 218, 225, 397 N.E.2d 737, 742, 422 N.Y.S.2d 47, 52 (1979), the New York Court of Appeals assumed without deciding that indemnity for punitive damages is available under N.Y.Gen. Mun.Law § 50–j (McKinney 1977), applicable outside New York City. Section 50–j, unlike section 50–k(3), does not explicitly exclude intentional wrongdoing or recklessness.

consequently did not take all the precautionary measures that they might otherwise have taken. For instance, the officers did not retain their own counsel, relying instead on the Assistant Corporation Counsel supplied by the City of New York. Moreover their defense strategies did not anticipate that the jury would be instructed to consider punitive damages. None of the officers testified about his or her financial status, even though such testimony would have been relevant to the determination of an appropriate punitive damage award. *See* *Zarcone v. Perry,* 572 F.2d 52, 56 (2d Cir. 1978). In addition, the three officers who testified before the pretrial order was amended were not aware that it might be important to explain to the jury their states of mind at the time of the shooting. In fact, when Officer Hear was questioned on direct examination about what she was thinking just before the shot was fired, defense counsel objected, and the District Court sustained the objection.

It would be an exaggeration, however, to maintain that appellants were caught wholly unawares by the modification of the pretrial order. The complaint had given notice of the claim for punitive damages. Moreover, the pretrial order noted that plaintiff expected to prove that "defendant police officers used excessive force and subjected the decedent to brutality," allegations that would support an award of punitive damages. The officers' argument that with proper notice of a punitive damages claim in the pretrial order they might have obtained their own counsel is cast in doubt by their failure to do so during the fourteen months that the complaint, with its explicit punitive damages claim, was pending prior to preparation of the pretrial order. There is more force to the argument that the late amendment of the order impaired defendants' opportunity to develop facts bearing on their liability for punitive damages and on the appropriate amount. Though they could have sought the opportunity to present additional testimony bearing on their motivations and their finances after the pretrial order was amended, they may understandably have been apprehensive of

adverse jury reaction to testimony given upon a return to the witness stand.

■ If the punitive damages award were otherwise valid, it would be a close question whether the late amendment of the pretrial order created undue prejudice; in the absence of other error, the award would either stand or be precluded, since it would normally not be appropriate to remedy a truly prejudicial amendment by affording a plaintiff a retrial on the omitted claim. In this case, however, as we explain below, an error independent of the amendment precludes the punitive damages award as made, thereby confronting us with a choice between retrial or preclusion of the punitive damages claim. Under these circumstances we do not believe the late amendment was so prejudicial that it should cause the plaintiff to lose her opportunity to retry that claim.

C. We turn then to the issue whether punitive damages in a section 1983 action may be assessed jointly against all defendants or must be determined, both as to liability and amount, individually against each defendant. This issue poses an initial analytical problem of deciding whether the answer is to be derived from a construction of section 1983 or from an application of state law made applicable by section 1988. This threshold problem arises because of the uncertain role of section 1988.

The Supreme Court has pursued various approaches in determining when issues arising in civil rights cases are to be governed by an interpretation of the governing civil rights statutes or by state law via section 1988. *See* Eisenberg, *State Law in Federal Civil Rights Cases: The Proper Scope of Section 1988,* 128 U. Pa. L. Rev. 499, 502–05 (1980). In deciding whether an action under section 1983 survives the death of the plaintiff, the Court used section 1988 to make state law dispositive. *Robertson v. Wegmann, supra.* The Court considered the absence of a survival provision in section 1983 to be a "deficien[cy]" within the meaning of section 1988, noted that relevant state law did not provide for survival

of actions at the suit of the particular relatives of the plaintiff who were bringing the action, and concluded that abatement of that particular action pursuant to state law was not inconsistent with federal law. Earlier, in deciding whether 42 U.S.C. § 1982 implies a damage remedy, the Court viewed section 1988 as affording a federal court a choice between "federal and state rules on damages ... whichever better serves the policies expressed in the federal statutes." *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 240, 90 S.Ct. 400, 406, 24 L.Ed.2d 386 (1969). Recently, in deciding whether punitive damages were available in section 1983 actions and in defining the standard for such damages, the Court appears to have grounded its decision directly upon a construction of section 1983, even though that provision is silent on the subject of punitive damages. *Smith v. Wade, supra.* The Court consulted common law precedents, but did so as a source of guidance for a proper construction of section 1983, not as operative law made applicable by section 1988. Of special pertinence to the outcome allowing punitive damages and applying a lenient standard to their award were the values sought to be protected by section 1983.

Since *Smith v. Wade* concerned the availability of punitive damages in section 1983 suits and the proper standard for awarding them, its analytical approach seems especially pertinent to our task of determining whether such damages require individual assessment. We will therefore follow the Supreme Court's approach and construe section 1983 in the light of both its policies and pertinent common law precedents. As *Smith v. Wade* makes clear, punitive damages are available under section 1983 to advance the statute's purpose of securing the protection of constitutional rights. An award of punitive damages punishes a defendant who has acted intentionally or recklessly to deny a plaintiff his protected rights, *Smith v. Wade, supra*, 103 S.Ct. at

1640, and helps secure rights for others by deterring future violations, *id.* at 1639. The degree of appropriate punishment and the extent to which deterrence may be achieved at an individual's expense are obviously matters appropriate for individualized determination. As the Court noted, punitive damages turn on "the character of the tortfeasor's conduct." *Id.* The function of punitive damages in section 1983 suits points forcefully toward assessing individually each defendant's liability for such damages and determining an appropriate amount.[4]

The common law has given different answers to our inquiry at different times. At one time common law judges regularly instructed juries to award punitive damages jointly against all defendants or not to award them at all. *See* J. Ghiardi & J. Kircher, *Punitive Damages* § 9.09, at 27 (1981). In some jurisdictions punitive damages were jointly assessed based on the behavior of the most culpable defendant, and in others a joint assessment was made based on the behavior of the least culpable defendant. *See* Comment, *Exemplary Damages and Joint Tortfeasors*, 18 Wash. & Lee L. Rev. 270, 271–72 (1961).

In modern times American jurisdictions have come to the conclusion that punitive damages should be assessed on an individual basis. A plaintiff who seeks to recover punitive damages from joint tortfeasors must "establish that each defendant against whom punitive damages are sought engaged in conduct which was sufficiently aggravated to justify the imposition of those damages." J. Ghiardi & J. Kircher, *supra*, § 9.09, at 27. This rule contemplates not only individual determination of each defendant's liability for punitive damages but also individual determination of the amount for which each defendant is liable. While this rule has not been adopted in every jurisdiction, *see, e.g., New York Times v. Sullivan*, 376 U.S. 254, 262, 84 S.Ct. 710, 716, 11 L.Ed.2d 686 (1964) (Alabama

---

**4.** The punitive damages award approved by the Supreme Court in *Smith v. Wade* was returned by a jury instructed as follows: "The amount of punitive or exemplary damages assessed against any defendant may be such sum as you believe will serve to punish that defendant and to deter him and others from like conduct." 103 S.Ct. at 1628.

law); *Gaston v. Gibson,* 328 F.Supp. 3 (E.D. Tenn.1969), it is the majority rule, *see* Annot., *Apportionment of Punitive or Exemplary Damages as Between Joint Tortfeasors,* 20 A.L.R.3d 666, 668–71 (1968). Moreover, it is accepted by commentators as the better view. *See* K. Redden, *Punitive Damages* § 3.3(B) (1980); Comment, *supra,* at 276. Thus, to the extent that common law authority aids interpretation of section 1983, a construction requiring individual assessment of punitive damages is indicated.

Even if we analyzed the issue as one arising under section 1988, on the theory that the absence of a specific procedure for assessing punitive damages is a deficiency in section 1983, we would reach the same conclusion. Section 1988 would refer us to the common law of New York, in which this trial was held, and New York favors individual assessment of punitive damages. *Raplee v. City of Corning,* 6 A.D.2d 230, 233, 176 N.Y.S.2d 162, 165 (4th Dep't 1958); *see* 1 *New York Pattern Jury Instructions* § 2:278, at 626 (2d ed. 1974). Application of such a state rule would manifestly not be inconsistent with any federal policy.

The instant case well illustrates the importance of assessing punitive damages individually in section 1983 cases. Though the evidence of each defendant's participation in the episode sufficed to permit a finding of liability for use of excessive force, the jury was entitled to view their roles quite differently in determining the appropriateness and amount of punitive damages. Sergeant Pezzano fired the fatal shot. Officer Ciravolo was observed by one witness repeatedly punching McFadden without provocation. Detective Sanchez was observed holding McFadden's arm. Officer Hear may have done little more than strike McFadden with her pocketbook. A jury properly instructed might well have found varying degrees of culpability and distinguished among the defendants as to the liability of each for punitive damages and the appropriate amount of such damages.

■ We therefore conclude that punitive damages must be individually assessed in suits under section 1983, *Davidson v. Dixon,* 386 F.Supp. 482, 489–90 (D.Del. 1974), *aff'd mem.,* 529 F.2d 511 (3d Cir. 1975); *see Gagnon v. Ball,* 696 F.2d 17, 19 n. 2 (2d Cir.1982), and that defendants are entitled to have the issue of punitive damages liability retried.[5] Upon retrial the jury should be advised that the defendants have been found liable for the use of excessive force and that $25,000 compensatory damages have been awarded; the jury is to determine with respect to each defendant whether the defendant should be obliged to pay punitive damages and, if so, in what amount.[6]

■ On the cross-appeal, we decline to disturb the District Court's exercise of discretion with respect to the appropriate amount of an attorney's fee. The decision not to award a bonus beyond the lodestar amount was not an abuse of discretion. Judge Ward was entitled to disallow claimed hours that he thought were not reasonable. Even though some of these hours were attributed to preparation of the

---

**5.** We recognize the possibility that the jury might have reduced their award of compensatory damages in light of the large amount of punitive damages awarded, thus arguably entitling the plaintiff to a retrial of all damages since part of the computation was erroneously made. In response to our inquiry at oral argument, plaintiff's counsel preferred to retain the compensatory damages award and accept retrial only of punitive damages in the event we ruled that portion of the judgment defective.

**6.** An appropriate form of special verdict might ask:

What amount of punitive damages, if any, is plaintiff entitled to receive from each of the following defendants?

Detective Juan Sanchez _____
Sergeant Robert Pezzano _____
Officer Michael Ciravolo _____
Officer Patricia Hear _____

This form is to be contrasted with the form normally appropriate for a special verdict as to compensatory damages, which simply asks the jury to determine what amount of compensatory damages, if any, the plaintiff is entitled to receive. *See Gagnon v. Ball, supra,* 696 F.2d at 19 n. 2.

fee application, for which compensation is normally allowed, the District Court was entitled to conclude that six hours for preparing an uncomplicated application was not reasonable.

That portion of the judgment awarding punitive damages is reversed and the cause remanded for further proceedings consistent with this opinion; on the cross-appeal the award of attorney's fees is affirmed. No costs.