Robert GREENE, Jr., as Administrator of the Estate of Robert L. Greene, and Nancy Velez on Behalf of her Infant Children Latisha Greene and Lisa Greene, Plaintiffs,

v.

The CITY OF NEW YORK, Robert J. McGuire, Commissioner of the Police Department of the City of New York, John Mayer and Carol Esserman, Defendants.

Nancy VELEZ, Plaintiff,

v.

The CITY OF NEW YORK, John Mayer and Carol Esserman, Defendants.

Nos. 83 Civ. 2256(MEL), 83 Civ. 1676(MEL).

United States District Court, S.D. New York.

Dec. 11, 1987.

Eugene Bogan, P.C., New York City, for plaintiffs.

Peter L. Zimroth, Corp. Counsel of the City of New York, New York City (Norma Kerlin, Bonnie Goldsmith, Asst. Corp. Counsels, of counsel); for defendants.

LASKER, District Judge.

Defendant John Mayer moves for judgment notwithstanding the verdict or, in the alternative, for a new trial. The motion is denied.[1]

In these two consolidated actions brought under 42 U.S.C. § 1983, plaintiffs Nancy Velez and Robert Greene Jr., as administrator of the estate of Robert L. Greene and on behalf of Latisha and Lisa Greene, sued two New York City police officers, John Mayer and Carol Esserman, for violations of their civil rights. In a tragic encounter on the night of March 31, 1981, Mayer, on duty, fired five shots at a car which Greene and Velez were driving. After the car crashed and Greene left the car, Mayer fired two more shots at him and Esserman fired one shot at him. Greene was killed and Velez wounded. Plaintiffs sought damages from both Mayer and Esserman for their physical and emotional injuries, charging 1) that the shooting constituted excessive force in violation of their constitutional rights; 2) that Velez was falsely arrested in violation of her Fourth and Fifth Amendment rights; and 3) that the officers' actions in killing Greene violated Latisha and Lisa Greene's constitutional right to parenthood. Plaintiffs also alleged various state law claims against the police officers.[2]

An eight-day jury trial was held commencing on October 14, 1986, during which the testimony of approximately eighteen witnesses were heard. After one of the jurors was excused due to illness during the course of jury deliberations, the parties agreed to be bound by a five-juror verdict. On October 27, 1987, the jury found Esserman not liable on all charges. The jury found for Velez on her excessive force claim against Mayer and awarded her $125,000 in compensatory damages and no punitive damages. The jury found for the Estate of Greene on its claim of excessive force and awarded $25,000 in punitive damages and no compensatory damages. Finally, the jury found for Latisha and Lisa Greene, Greene's children, on their deprivation of parenthood claim, awarding each girl $100,000 in compensatory damages and $125,000 in punitive damages. The parties later stipulated that if the court were to charge the jury on the state law claims of wrongful death brought by Robert Greene Jr. on behalf of Latisha and Lisa Greene, the jury would have awarded the same damages.

Mayer moves for judgment notwithstanding the verdict or for a new trial on a number of grounds, including: 1) the court erred in submitting to the jury the issue whether defendants intentionally violated Latisha and Lisa Greene's right to parenthood because there is no such right and because there was no proper finding that Greene was their father; 2) the charge to the jury on the elements of § 1983 was erroneous; 3) there was insufficient evidence of intent to support the jury's finding of liability; 4) the damages awarded by the jury were excessive and inconsistent; and 5) improper evidentiary rulings necessitate a new trial.

**Testimony at Trial**

The following testimony was heard at trial. Velez, who is Hispanic, and Greene, who was Black, had lived together as "common-law" husband and wife for about eleven years. Velez testified that her two children, Lisa and Latisha, who were respectively aged seven and two years old at the time of Greene's death, were Greene's children, had lived with her and Greene, and had been openly acknowledged by Greene as his children. This testimony was undisputed and was confirmed by the testimony of Robert Greene Jr., Greene's adult legitimate child by an earlier marriage.

1. This motion was timely filed on December 19, 1986, but was not fully briefed until October 28, 1987.

2. Various other civil rights claims against Mayer, Esserman and the City of New York were withdrawn or dismissed prior to and at the conclusion of the trial.

On the evening of March 31, 1981 Velez and Greene had been grocery shopping and then had gone to a pool room together. After leaving the pool room at about 10:30 pm, they walked to Greene's car, which was parked near the intersection of 162 Street and Third Avenue in the Bronx. Velez got in on the driver's side and started the engine.

On the same night, Esserman and Mayer were on duty in plainclothes in an unmarked car. At around 10:30 pm, they heard a radio call that two male blacks with guns were involved in a dispute at a nearby bar close to the corner of 162nd Street and Third Avenue. When they arrived at the corner, the officers parked their car near the car in which Velez and Greene were sitting. Mayer got out of his car with his gun drawn and began to walk toward the bar, which was also in the direction of the Velez car.

Velez testified that Mayer never identified himself as a police officer. She stated that when she saw a white man approaching the car with a gun in hand, she attempted to make a U-turn to drive away from him. Mayer, however, testified that he heard a shot from the area in front of him, saw two people in the car, identified himself as a police officer, and ordered the people in the car not to move. He testified that when the car passed him at high speed, he saw a gun pointed out of the passenger side. It is undisputed that Mayer then fired five shots at the car, one of which hit Velez in her right elbow as she attempted to shield her face. She lost control of the car, which then crashed into a store. After the crash, Greene left the car and began to run west on 162 Street. Mayer fired two more shots at him and Esserman fired one shot at him as he ran. Greene was later found dead with a gun

shot wound in his back. No weapon was found on either Greene or Velez or, after a search, in the surrounding area. Greene and Velez were never connected to the dispute at the bar or to any other unlawful behavior that night.[3]

**Discussion**

## I. *Constitutional Right to Parenthood*

Mayer argues first, that there is no § 1983 cause of action for deprivation of parenthood, and second, that if there is, Lisa and Latisha Greene would still not be entitled to recover under state laws governing paternity and recovery by illegitimate children in wrongful death actions.

■ Although neither the Supreme Court nor the court of appeals for this circuit has addressed the issue whether the children of a parent killed by state action may sue under § 1983,[4] in other contexts it is well established that there is a broadly defined liberty interest in preserving the integrity and stability of the family from intervention by the state without due process of law. A host of Supreme Court cases stand for the proposition that there is a "private realm of family life which the state cannot enter." *Moore v. East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) (quoting from *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944)); *accord, Roe v. Wade,* 410 U.S. 113, 152–153, 93 S.Ct. 705, 726–727, 35 L.Ed.2d 147 (1973); *Wisconsin v. Yoder,* 406 U.S. 205, 232–33, 92 S.Ct. 1526, 1541–42, 32 L.Ed.2d 15 (1972); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972). Applying this principle, the Second Circuit has approved § 1983 claims based on broadly defined concepts of family integrity, recognizing that "the most essential and basic aspect of familial privacy" is:

---

**3.** Because there was evidence that both Mayer and Esserman fired at Greene, the court explained to the two officers *in camera* that their joint representation by the same Assistant Corporation Counsel of the City of New York meant that both officers were in effect "giving up the right to argue that whatever happened wasn't your fault, it was your partner's fault." Tr. at 710. Both officers stated that they understood

and were still satisfied with single representation.

**4.** The Supreme Court has twice granted certiorari to consider this issue, but in both instances later dismissed the petitions. *See Jones v. Hildebrant,* 432 U.S. 183, 97 S.Ct. 2283, 53 L.Ed.2d 209 (1977); *O'Dell v. Espinoza,* 456 U.S. 430, 102 S.Ct. 1865, 72 L.Ed.2d 237 (1982).

the right of the family to remain together without the coercive interference of the awesome power of the state. This right to preservation of family integrity encompasses the reciprocal rights of both parent and children. It is the interest of the parent in the "companionship, care, custody and management of his or her children," and of the children in not being dislocated from the "emotional attachments that derive from the intimacy of daily association," with the parent. *Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir.1977) (mother has cognizable claim under § 1983 for seizure of her children by welfare authorities without a hearing or court order); *see also Rivera v. Marcus,* 696 F.2d 1016, 1022–25 (2d Cir.1982) (half sister has cognizable § 1983 claim based on liberty interest in protecting her half sister and brother from removal from her home by state authorities).

Furthermore, Latisha and Lisa Greene's claims are strongly supported by the decisions of a number of other circuit courts: those circuits which have considered the question have concluded that there is a § 1983 claim for deprivation of the parent-child relationship in the wrongful death context. *See Bell v. City of Milwaukee,* 746 F.2d 1205 (7th Cir.1984) (father may recover under § 1983 for deprivation of constitutional interest where police officers shot and killed son); *Kelson v. City of Springfield,* 767 F.2d 651 (9th Cir.1985) (parents may bring § 1983 action for deprivation of liberty interest in the society of their son where school failed to prevent son from committing suicide); *Smith v. City of Fontana,* 818 F.2d 1411 (9th Cir.1987) (children may bring § 1983 action for deprivation of father's companionship where police officers killed father during arrest), *cert. denied,* — U.S. —, 108 S.Ct. 311, 98 L.Ed. 269 (1987); *Trujillo v. Board of County Commissioners,* 768 F.2d 1186 (10th Cir.1985) (mother and sister have constitutionally protected interest in relationship with son and brother); *Estate of Bailey by Oare v. County of York,* 768 F.2d 503, 509 n. 7 (3d Cir.1985) (adopting the holding of *Bell* that a parent whose child has died as a result of unlawful state ac-

tion may maintain an action under § 1983 for deprivation of liberty); *Mattis v. Schnarr,* 502 F.2d 588 (8th Cir.1974) (father whose son is shot by police officer has standing to sue under § 1983 and states a claim for deprivation of parenthood without due process of law); *cf. Grandstaff v. City of Borger,* 767 F.2d 161 (5th Cir.1985) (without discussing constitutional issues, court upholds jury verdict in § 1983 action awarding $200,000 to father whose son was shot by police officers), *cert. denied,* — U.S. —, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987); *Logan v. Hollier,* 711 F.2d 690 (5th Cir.1983) (remanding to district court question whether plaintiff whose daughter was killed by police officers has a cognizable claim under § 1983), *cert. denied,* 466 U.S. 936, 104 S.Ct. 1909, 80 L.Ed.2d 458 (1984); *but cf. Valdivieso Ortiz v. Burgos,* 807 F.2d 6 (1st Cir.1986) (rejecting in narrow holding claim that stepfather and siblings have a constitutionally protected interest in the companionship of adult son and brother).

■ The *Bell* court, which articulated the grounds for its decision most fully, based its conclusions on two principal grounds: first, the constitutional protection accorded the parent-child relationship by the Supreme Court in the cases discussed above, *see Bell,* 746 F.2d at 1242–44, and second, the legislative history of the Ku Klux Klan Act of 1871, the precursor of § 1983. In a description of the Act, Representative Butler stated:

This then is what we offer to the people of the United States as a remedy for wrongs, arsons and murders done. This is what we offer to a man whose house has been burned, as a remedy; to the woman whose husband has been murdered, as a remedy; *to the children whose father has been killed,* as a remedy.

Cong.Globe, 42d Cong., 1st Sess. 807 (1871) (emphasis added). This specific language clearly supports plaintiffs' position. *See Bell,* 746 F.2d at 1244; *Smith,* 818 F.2d at 1419; *see generally* Steinglass, *Wrongful Death Actions and Section 1983,* 60 Ind. L.J. 559, 644–54 (1985) (describing legisla-

tive history of Civil Rights Act of 1871 as demonstrating the 42d Congress' vital concern with § 1983 as a remedy for wrongful killings); *cf. Brazier v. Cherry*, 293 F.2d 401, 404 (5th Cir.1961) ("[I]t defies history to conclude that Congress purposely meant to assure to the living freedom from such unconstitutional deprivations, but that, with like precision, it meant to withdraw the protection of civil rights statutes against the peril of death."). For both these reasons, I conclude, as I ruled during the course of trial, that Lisa and Latisha Greene have a claim under § 1983 for wrongful deprivation of parenthood.

Mayer argues that if such a § 1983 claim is found to be actionable, instead of relying on *Bell* and the other cases cited above, the reasoning of *Trujillo v. Board of County Commissioners*, 768 F.2d 1186 (10th Cir. 1985), should be adopted. In *Trujillo*, the Tenth Circuit held that although a mother has a constitutionally protected interest in her relationship with her son, under the Supreme Court's decision in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed. 420 (1981), "an allegation of intent to interfere with a particular relationship protected by the freedom of intimate association is required to state a claim under § 1983." *Trujillo*, 768 F.2d at 1190. The *Trujillo* court rejected the reasoning of *Bell* because *Bell*'s

> rationale would permit a section 1983 claim by a parent whose child is negligently killed in an accident with a state official, a result expressly disapproved in *Parratt*. . . .

*Id.* at 1190. However, the *Trujillo* court's reasoning is not compelling. Clearly, the Supreme Court has held that § 1983 actions may not be brought under certain constitutional provisions based on negli-

gent acts. *See Daniels v. Williams*, 474 U.S. 327, 334, 106 S.Ct. 662, 666, 88 L.Ed.2d 662 (1986) (mere lack of due care does not implicate Due Process Clause of Fourteenth Amendment). Indeed, the jury in this case was specifically charged that Mayer could not be held liable if his actions were merely negligent. However, to require in this context, in addition to the intent to shoot with reckless disregard as to the consequences, a specific awareness on the defendant's part that the plaintiff had children who would be deprived of his companionship if he were killed would effectively nullify the right altogether in the wrongful death context. *See Smith*, 818 F.2d at 1420 n. 12 (rejecting *Trujillo*'s logic and holding that "[a]s long as state official's *action* which deprived the plaintiffs of their liberty was more than merely negligent, the plaintiffs can state a Section 1983 claim without further allegations that the official was trying to break up the family").

 Next, Mayer argues that Latisha and Lisa Greene are not entitled to any compensation even if there is a constitutional claim for deprivation of parenthood under § 1983 because there was insufficient evidence of Greene's paternity under New York law governing inheritance by children born out of wedlock. This argument is not persuasive.[5] At the outset, it must be stressed that the evidence of Greene's paternity was absolutely uncontroverted. Both Velez, Greene's "common-law" wife for some eleven years, and Robert Greene Jr., Greene's legitimate son by his former wife, testified that Greene, who lived with and supported the two children, acknowledged himself to be and was in fact Latisha's and Lisa's father. Mayer neither

---

5. Mayer also argues that this court was without jurisdiction to make any finding of paternity, because under N.Y.Jud.Law Art. 5 § 511 (McKinney 1983), the New York State Family Court is vested with exclusive original jurisdiction "in proceedings to establish paternity." This argument is entirely off point. Section 511 applies to paternity actions in which a mother seeks an adverse finding of paternity against the putative father for the purpose of seeking financial support and other relief. Such was not the case in this action, where the "finding" that

Latisha and Lisa Greene were Greene's children —a fact which was in no way contested—was simply incident to this court's federal jurisdiction and power to decide cases brought under § 1983. *Cf. Charles for Charles v. Schweiker*, 569 F.Supp. 1341, 1342 (E.D.N.Y.1983) (making finding of paternity under N.Y.Estate Powers & Trusts Law § 4–1.2(a)(2)(C) in action brought under Social Security Act). Indeed, the court's ruling was specifically limited to the context of this case. Tr. at 629–30.

presented nor offered to present any evidence to the contrary. Under these circumstances, Latisha and Lisa Greene's recovery of damages was not inconsistent with New York law and was fully consistent with the goals of § 1983.

Under an amendment to the New York law of inheritance which became effective on September 1, 1981, a child born out of wedlock may inherit from her father if "paternity has been established by clear and convincing evidence and the father of the child has openly and notoriously acknowledged the child as his own." N.Y. Est. Powers & Trusts § 4–1.2(a)(2)(C) (McKinney 1981). Mayer argues that § 4–1.2(a)(2)(C) may not be relied upon here because Greene was killed in March 1981 and the provision does not have retroactive effect.

■ New York courts are divided on the issue whether § 4–1.2(a)(2)(C) should be given retroactive effect. At least two courts, focussing on the potential unfairness to those distributees whose interests in the dead father's estate had already vested, have held that the provision cannot be given retroactive effect. *See, e.g., Estate of Smith*, 118 Misc.2d 165, 460 N.Y.S. 2d 441 (Surrogate's Court, Bronx Co. 1983); *Estate of Smith*, 114 Misc.2d 346, 451 N.Y. S.2d 546, 549 (Surrogate's Court, Queens Co. 1982) (retroactive application of § 4–1.2(a)(2)(C) would result in an unconstitutional "deprivation of private property without 'due process of law'" to distributees with vested rights). At least two other New York courts, however, have held to the contrary, finding that retroactive application is consistent with the New York State legislature's intent to liberalize the inheritance rights of illegitimate children. *See Estate of Kenny*, 114 Misc.2d 203, 450 N.Y.S.2d 1003, 1011 (Surrogate's Court, Kings Co. 1982); *Matter of Estate of Crist*, 116 Misc.2d 1078, 457 N.Y.S.2d 182, 185 (Surrogate's Court, Orange Co. 1982) ("It would run counter to the groundswell of judicial effort to ameliorate the unfair disadvantage of innocent children born out of wedlock ... to exclude from this remedial, evidentiary and procedural subdivision ...

all the children born out of wedlock who suffered the misfortune of the death of their putative father prior to its effective date"). Most persuasively, the only federal court to have considered this issue has held under circumstances where, as here, there was "no danger of divesting other individuals of statutorily vested property rights" that § 4–1.2(a)(2)(C) may be applied retroactively. *Charles for Charles v. Schweiker*, 569 F.Supp. 1341, 1343 (E.D.N.Y.1983). I conclude that § 4–1.2(a)(2)(C) is applicable retroactively here, and that the uncontroverted evidence of Greene's paternity met the requirements of New York law.

Furthermore, if New York state law were to be interpreted as barring Latisha and Lisa Greene's recovery, there is a strong argument that state law should not be applied. Under 42 U.S.C. § 1988, state law may only be applied in actions under the civil rights laws to the extent that it is "not inconsistent with the Constitution and laws of the United States." To deny Lisa and Latisha Greene recovery under their deprivation of parenthood claim because they are born out of wedlock and their father was killed before an order of filiation could be entered would be manifestly inconsistent with the compensatory and deterrent policies underlying § 1983. *See Robertson v. Wegmann*, 436 U.S. 584, 591, 98 S.Ct. 1991, 1995, 56 L.Ed.2d 554 (1977); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1251–53 (7th Cir.1984); *McFadden v. Sanchez*, 710 F.2d 907, 911 (2d Cir.1983) ("To whatever extent section 1988 makes state law applicable to section 1983 actions, it does not require deference to a survival statute that would bar or limit the remedies available under section 1983 for unconstitutional conduct that causes death"), *cert. denied*, 464 U.S. 961, 104 S.Ct. 394, 78 L.Ed.2d 337 (1983).

In sum, I conclude that Latisha and Lisa Greene are entitled to recover under § 1983 for the deprivation of their father's companionship.

## II. *The Intent Element of § 1983*

Mayer argues first, that the court incorrectly charged the jury on the intent ele-

ment of § 1983, and second, that there was insufficient evidence of the requisite intent to support the jury's finding of liability. Both arguments must be rejected.

The jury was charged the following on the issue of the intent necessary to establish liability on an excessive force claim brought under § 1983:

> Now, to establish a claim under Section 1983 and to win, plaintiff must show either that the defendant in question intended the actions which resulted in violation of the plaintiffs' rights, or that defendants committed such acts recklessly. This does not mean that either Officer Esserman or Officer Mayer intended to wound somebody or intended to kill somebody. What it does mean is that the plaintiff must establish that the officers intended to shoot, as they did.

> If you find ... that the acts of the defendants were merely negligent, then even if you find that the plaintiffs were injured as a result of those actions you must return a verdict for the defendants....

> Now, to come a little closer to the facts of this case, the rule is that a person, even if he is being lawfully arrested, has a constitutional right to be free of excessive force.... A police officer is entitled to use such force as a reasonably trained police officer who then is required to take an arrested citizen into custody would use....

> In determining whether a police officer has used excessive force in violation of the constitution, you should consider all the facts which you find to have been proven in this case, including the need, if any, for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, whether the force was applied in a good faith effort to maintain or restore discipline, or mali-

ciously or sadistically for the purpose of causing harm.

> Now, it is very important for you to understand—in fact it is the core of the case—that in assessing the conduct of the police officers Esserman and Mayer you should consider whether they acted in good faith and whether the officer whose case you are then considering—because you have to consider each person's case separately—in good faith reasonably believed that his or her actions were proper and lawful under the circumstances. I instruct you that if you find either that Police Officer Esserman's and Mayer's, as the case may be, use of force was reasonable under the circumstances, or that the police officer in question in good faith reasonably believed that there was a need to use deadly force to prevent injury to him or herself or others, then your verdict should be for that defendant.[6]

■ Mayer has not established that this charge was incorrect as to the necessary element of intent. The jury was clearly charged that 1) it could not find for plaintiffs if defendants' actions were merely negligent; 2) that the defendants could only be held liable if their actions were intentional or reckless; 3) that a determination of excessive force depended on examination of various factors, including the extent of the force applied, whether it was necessary, the extent of the injury involved and whether the force was applied in good faith or maliciously; and 4) that under no circumstances could defendants be found liable if it was determined that they had acted in good faith. This jury charge comports with the intent standards set for § 1983 excessive force claims as articulated in *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).[7] In fact

---

6. Transcript ("Tr.") at pp. 728–30.

7. Clearly *Johnson* stands for the proposition that not every intentional and unpermitted contact with the plaintiff's person is actionable under § 1983, 481 F.2d at 1032. However, *Johnson* does not stand for the bald proposition that in order to prevail on an excessive force claim

plaintiff must establish malicious intent. Instead, *Johnson* teaches that a finding of excessive force depends on a determination of the factors spelled out above. *See, e.g., Hodges v. Stanley,* 712 F.2d 34, 36 (2d Cir.1983); *cf. Fiacco v. City of Rensselaer,* 783 F.2d 319, 325 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987) (upholding jury

the language of the charge on the factors to be considered in deciding an excessive force claim closely tracked the language of *Johnson*, 481 F.2d at 1033. In sum, the jury was sufficiently charged that defendants' liability depended not only upon a finding that Mayer intentionally or recklessly shot plaintiffs but also on a finding that Mayer had used excessive force against plaintiffs under the balancing test set forth in *Johnson*.

■ Mayer's argument that there was insufficient evidence on the issue of intent to support the jury's finding against Mayer must similarly be rejected. A motion for judgment notwithstanding the verdict can not be granted unless there is only one conclusion as to the verdict that a reasonable juror could have reached. *See Mallis v. Bankers Trust Co.*, 717 F.2d 683, 688 (2d Cir.1983). This was hardly such a case. In short, the jury could reasonably have concluded based on the evidence that Greene and Velez were sitting innocently in their car when the shooting occurred, that Esserman and Mayer failed to identify themselves as police officers, and that Mayer fired numerous shots indiscriminately and without provocation at Greene and Velez.

## III. *Damages*

### a) *Latisha and Lisa Greene: Compensatory Damages*

The jury awarded Latisha and Lisa Greene $100,000 each in compensatory damages on their deprivation of parenthood claims. Mayer argues that the jury charge on the issue of the children's compensatory damage claims was confusing, and that these awards were excessive and unsupported by the evidence. Mayer's arguments are rejected.

■ Latisha and Lisa Greene's damage claims under § 1983 are governed by New York state wrongful death law, which provides for an adequate measure of damages, and thus, as required by § 1988, is consistent with the goals of § 1983. Under N.Y. Est. Powers & Trusts Law § 5–4.3 (McKinney 1981), damages in a wrongful death action are measured by and limited to the "fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought." It is well settled that these "pecuniary injuries" include not only losses of "direct financial benefits" but also "loss of the nurture, care and guidance [the decedent] would provide [his] children had death not intervened." *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 52 (2d Cir.1984); *accord, Zaninovich v. American Airlines, Inc.*, 26 A.D.2d 155, 271 N.Y.S.2d 866, 873 (1966).

■ The compensatory damages awarded here were not excessive. Although Greene was evidently a poor man, and the evidence of his earning capacity was scanty, the award of $100,000 compensatory damages to each child is clearly reasonable based on loss of nurture, care and guidance alone, given that the girls were only two and seven years old when their father died. For the same reason, the compensatory damage awards to Lisa and Latisha Greene are not inconsistent with the finding that Greene's estate—whose damages were limited to the amount established by the evidence that Greene would have legally and legitimately earned in his lifetime had he not been killed—was not entitled to any compensatory damages.

Mayer argues that the jury charge was confusing on the issue of the Greene children's compensatory damages because it included estimations of both Greene's life expectancy and his children's life expectan-

---

verdict for plaintiff on § 1983 excessive force claim which could be interpreted as a finding that defendant police officers "had used excessive force against Fiacco in violation of her constitutional rights, and that they should have known that they were violating these rights, but that their acts were not malicious"). The Supreme Court's decision last year in *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 1085, 89

L.Ed. 251 (1986), which concerned the appropriate standard to be applied on an excessive force claim brought under the Eight and Fourteenth Amendments "[w]here a prison security measure is undertaken to resolve a disturbance ... that indisputably poses significant risks to the safety of inmates and prison staff," is not to the contrary.

cies, whereas "[t]he life expectancies of the distributees are relevant only insofar as they provide the jury with information as to the joint life expectancies of the decedent and the distributees."[8] This objection to the charge, which was never raised in the charging conference or at any point at trial, is without merit. The jury was clearly charged that the children's damages were limited to the pecuniary value Greene would have bestowed on them had he lived, and there is no support for the argument that the jury's damage award reflected compensation beyond the expected span of Greene's life.

### b) *Nancy Velez's Compensatory Damage Award*

Nancy Velez was awarded $125,000 in compensatory damages for her claims under § 1983. The circumstances of the rendering of this verdict deserve some comment. On October 28, 1986, the jury sent a note to the court that it had reached a complete verdict as to one plaintiff's claims—this plaintiff was later determined to be Velez—and had reached a verdict as to the other plaintiffs' claim against one defendant, but was having difficulty deciding the remaining plaintiffs' claims as to the other defendant. The jury also requested a clarification of the terms "preponderance of the evidence" and "good faith."[9] When the jury was asked its verdict as to Velez, it announced that it had found Mayer liable for $75,000 in compensatory damages. The jury was then recharged on the requested legal definitions.

Then, however, at the request of plaintiffs' counsel in conference, the court asked the jury to consider the question whether this damage award was "intended to compensate [Velez] both for the invasion of her constitutional rights and for her physical injury."[10] The jury, after deliberating, stated that it was divided on this question. The jury was then charged that "as a mat-

ter of law [the jury's split on the question] means that the jury has not reached a verdict with regard to the amount of damages for Ms. Velez because in order to reach any verdict, the verdict must be unanimous."[11] The jury was further charged that:

As to the deprivation of constitutional rights, the law requires that some compensation be made but it may be what is called nominal, that's token. That's understood in the law. It is not required, but it is permissible to give only token damages to the deprivation of her constitutional rights alone as distinct from the physical injuries that occurred.

Physical injuries must be compensated for on a basis which you consider fair and which takes into consideration all the losses that I instructed you about and I charged you about.[12]

After several hours of deliberation, the jury made another announcement: that it was deadlocked five to one and that one of the jurors wished to be excused for health reasons. When the court questioned the foreperson of the jury, she stated that the sick juror was also the one who differed from the other five. On consent of counsel, the sick juror was excused and the five remaining jurors were requested to reach a unanimous verdict. An hour later, the five-person jury returned a complete and unanimous verdict as to all plaintiffs' claims, which, *inter alia,* awarded Velez $125,000 in compensatory damages. The jury was polled and each stated that the verdict was his or hers.

Mayer raises two objections to the final award of $125,000 to Velez, neither of which was articulated at trial. First, Mayer argues that when the jury announced that it had reached a decision as to Velez but also requested clarification of two legal terms in connection with its decision as to the other plaintiffs' claims against one of

---

**8.** Memorandum of Law In Support of Defendants' Motion for Judgment Notwithstanding the Verdict, For a Reduction of the Damages, Or, In the Alternative, for a New Trial ("Mayer Memorandum") at 49 (January 28, 1987).

**9.** Tr. at 763.

**10.** Tr. at 774.

**11.** Tr. at 779.

**12.** Tr. at 780.

the defendants, the verdict as to Velez should not have been accepted prior to re-charging the jury on the terms requested. Mayer argues that "the jury could not render a sustainable verdict on the claims of Nancy Velez, or any other plaintiff without an understanding of the basic legal concept of 'preponderance of evidence' or 'good faith.'[13] However, no objection was made to this procedure at the time, and it is entirely reasonable to assume that the jury's request for further clarification of the terms was necessary only as to the other plaintiffs and not as to Velez because the other plaintiffs' claims presented closer questions more difficult to decide.

Second, Mayer argues that the award of $125,000 must be set aside because it represents compensation for abstract constitutional injury in violation of *Memphis Community School District v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). In *Stachura*, the Supreme Court considered the jury charge on damages in a § 1983 action brought by a teacher who had been suspended with full pay alleging violations of his due process and first amendment rights. At trial, the jury was charged that in addition to considering lost earnings, out-of-pocket expenses, and any mental or emotional distress caused by the defendant school board's actions, damages also could be awarded based on the value or importance of the constitutional rights that were violated. The trial court told the jury that:

> The precise value you place upon any Constitutional right which you find was denied to Plaintiff is within your discretion. You may wish to consider the importance of the right in our system of government, the role which this right has played in the history of our republic, [and] the significance of the right in the context of the activities which the Plaintiff was engaged in at the time of the violation of the right.

*Stachura*, 106 S.Ct. at 2541. The jury found for the plaintiff and awarded $275,-000 in compensatory damages and $46,000 in punitive damages. The Supreme Court reversed the affirmance of this damage award by the Court of Appeals for the Sixth Circuit, and remanded for a new trial on compensatory damages.

The *Stachura* court reasoned that the trial court's instructions as to damages for constitutional injuries could not be squared with the seminal decision on damages under § 1983 in *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed. 252 (1978), in which the Supreme Court held that a § 1983 plaintiff could recover compensatory damages only if he proved actual injury caused by the denial of his constitutional rights. The *Stachura* court concluded that:

> [D]amages based on the "value" of constitutional rights are an unwieldy tool for ensuring compliance with the Constitution. History and tradition do not afford any sound guidance concerning the precise value that juries should place on constitutional protections. Accordingly, were such damages available, juries would be free to award arbitrary amounts without any evidentiary basis, or to use their unbounded discretion to punish unpopular defendants. Such damages would be too uncertain to be of any great value to plaintiffs, and would inject caprice into determinations of damages in § 1983 cases. We therefore hold that damages based on the abstract "value" or "importance" of constitutional rights are not a permissible element of compensatory damages in such cases.

*Stachura*, 106 S.Ct. at 2545 (citations omitted).[14] In addition, the court noted that the instruction in question could not be dismissed as harmless error because "the jury awarded respondent a very substantial amount of damages, none of which could have derived from any monetary loss." *Id.* at 2546.

■ After careful consideration of the *Stachura* decision, I conclude that a new

---

13. Mayer Memorandum at 53.

14. Justice Marshall, in a concurrence joined by three other justices, concluded that "the violation of a constitutional right, in proper cases, may itself constitute a comparable injury," 106 S.Ct. at 2546, if the award for the constitutional injury is "proportionate to the actual loss sustained." *Id.* at 2547.

trial on the issue of compensatory damages is not warranted here. Several important factors distinguish the instruction and damage award at issue here from the instruction and award considered in *Stachura.* At the outset, Mayer never stated an objection to the instruction based on *Stachura,* as required by Fed.R.Civ.P. 51. Although Mayer's counsel did object to the jury's reconsideration of Velez's damage award, counsel stated only that:

I think that the charge was clear on this issue, the question is clear. To ask the jury to reconsider once again a question that they have already considered is entirely unnecessary. Either the verdict should stand or we should get a mistrial or one or the other but I don't think the jury should be reconsidering the question again.[15]

Furthermore, the instruction here on damages for deprivation of constitutional rights was limited in scope in comparison to the instruction in *Stachura* and discouraged speculation rather than encouraging it: the jury here was instructed only that "[i]t is not required, but it is permissible to give only token damages to the deprivation of her constitutional rights alone as distinct from the physical injuries that occurred."[16] This instruction cannot be read as inviting "the jury to speculate on matters wholly detached from the real injury occasioned respondent by the deprivation of the right," as did the jury charge rejected in *Stachura.* *Stachura,* 106 S.Ct. at 2548 (Marshall, J. concurring).

Finally, and most important, Velez clearly suffered extensive actual physical, mental and financial injuries from Mayer's actions, in relation to which the jury's award of $125,000 was reasonable and supported by the evidence. This distinguishes this case from *Stachura,* where $275,000 was awarded in compensatory damages although the plaintiff had suffered no physical or financial injury.[17]

### c. *Punitive Damages*

Mayer argues that the punitive damages awarded to Lisa and Latisha Greene and the Estate of Greene are unsupported by the evidence. This claim is without merit. It is well established that:

punitive damages are available under Section 1983 to advance the statute's purpose of securing the protection of constitutional rights. An award of punitive damages punishes a defendant who has acted intentionally or recklessly to deny a plaintiff his protected rights, and helps secure rights for others by deterring future violations.

*McFadden v. Sanchez,* 710 F.2d 907, 913 (2d Cir.) (citing *Smith v. Wade,* 461 U.S. 30, 40, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)), *cert. denied,* 464 U.S. 961, 104 S.Ct. 394, 78 L.Ed.2d 337 (1983). As discussed above, the evidence was sufficient here under this standard to allow a reasonable jury to award punitive damages against Meyer.[18]

### IV. *Evidentiary Issues*

Mayer argues that two evidentiary rulings allegedly adverse to him require a

---

**15.** Tr. at 777. In fact, the original charge on damages as to Velez also included language that "among the elements of injury and harm which you consider in granting compensatory damages are the violation of a plaintiff's rights ...[,] the violation of her constitutional rights...." Tr. at 733. No objection was made to this initial charge.

**16.** Tr. at 780.

**17.** Mayer also argues that the instruction tainted the damage award as to the Estate of Greene's claims and Latisha and Lisa Greene's claims as well. Even overlooking Mayer's failure to object to the instruction at all as to the other plaintiffs' claims, and the fact that the instruction was specific as to Velez, this argument is rejected for the reasons stated above.

**18.** As to punitive damages, the jury was charged that:

Punitive damages, ... are allowable only when it is determined that a defendant's conduct has been wanton and reckless or maliciously imposed. Punitive damages are allowed if you make such a finding against a defendant, not for the purpose of compensating a plaintiff, although the damages do go to the plaintiff, but for the purpose of setting an example that such kind of behavior should not be allowed to recur. Therefore, punitive damages may be awarded against any defendant only if you find that that defendant's conduct was egregious and was wanton, with total, deliberate disregard of the rights of the plaintiffs.

Tr. at 732.

new trial of this action. This argument may be quickly dismissed. First, Mayer argues that evidence of Greene's criminal record should have been admitted, as relevant both to a determination of Greene's future earnings in assessing damages and as providing a motive for Greene's actions on the night of his death. Greene's criminal record consisted of a felony conviction in 1964 and several bench warrants which were outstanding at the time of his death in March 1981. All but one of these warrants were for traffic violations; the remaining warrant was issued in 1977 for second degree robbery. Under these circumstances, Greene's criminal record was in no way relevant to any issue and could only have served to prejudice the jury. Indeed, the point is moot as to Greene's damages, since his estate was not awarded any compensatory damages.

■ Second, Mayer argues that the court improperly excluded the testimony of a Sergeant Thomas Ford. Mayer offered Ford's testimony to establish that when Greene's dead body was found, his pockets appeared to have been turned inside-out and were empty. Mayer argues that "the testimony of Sgt. Ford, when viewed together with the other testimony ..., would support a reasonable inference by the jury that Mr. Greene's money, and the gun defendants alleged he had, had either been removed from his person or discarded at some point." [19] I conclude that this testimony was properly excluded as speculative and prejudicial.[20]

\* \* \* \* \* \*

In sum, Mayer's motion for judgment notwithstanding the verdict and for a new trial is denied.

It is so ordered.

---

19. Mayer's Memorandum of Law at 63.

20. As a miscellaneous point, Mayer also argues that it was error for the court to instruct the jury that the police officer witnesses who testified had "a lesser degree of interest [than Velez, Mayer and Esserman] but a degree of interest in how the case turns out." Tr. at 722. Read in the context of the charge as a whole, this language, to which Mayer did not object at trial, was entirely proper.